1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                   EASTERN DIVISION

4

5    UNITED STATES OF AMERICA

6         vs.                    CASE NO.: 3:19cr364-ECM

7    NAYEF AMJAD QASHOU,

8              Defendant.

9              * * * * * * * * * * * * * *

10                 SENTENCING (NOT HELD)

11             * * * * * * * * * * * * * *

12        BEFORE THE HONORABLE EMILY C. MARKS, UNITED STATES

13   DISTRICT JUDGE, at Montgomery, Alabama, on Tuesday, June 30,

14   2020, commencing at 9:57 a.m.

15                      APPEARANCES

16   FOR THE GOVERNMENT:    Mr. Robert K. Nichols III
                            Mr. Joshua J. Wendell
17                          Assistant United States Attorneys
                            OFFICE OF THE UNITED STATES ATTORNEY
18                          131 Clayton Street
                            Montgomery, Alabama  36104
19
     FOR THE DEFENDANT:     Ms. Sandi Y. Irwin
20                          Mr. Stephen P. Ganter
                            FEDERAL DEFENDERS
21                          MIDDLE DISTRICT OF ALABAMA
                            817 South Court Street
22                          Montgomery, Alabama 36104

23        Proceedings reported stenographically;

24        transcript produced by computer

25

```
 1                     EXAMINATION INDEX

 2    ASMA QASHOU

 3        DIRECT BY MS. IRWIN                               6

 4    AMJAD QASHOU

 5        DIRECT BY MS. IRWIN                              15
          CROSS BY MR. NICHOLS                             21
 6
```

```
 7                * * * * * * * * * * * *

 8     (The following proceedings were heard before the Honorable

 9      Emily C. Marks, United States District Judge, at

10      Montgomery, Alabama, on Tuesday, June 30, 2020, commencing

11      at 9:57 a.m.)

12     (Call to Order of the Court)

13          THE COURT:  Good morning.  We're here for a sentencing

14    in the case of United States versus Nayef A. Qashou, case number

15    19cr364.

16          Would counsel for the government please identify

17    yourself for the record.

18          MR. NICHOLS:  Yes, Your Honor.  Good morning.  Robert

19    Nichols and Josh Wendell for the United States.

20          THE COURT:  Good morning.  And would counsel for the

21    defendant identify yourself, please.

22          MS. IRWIN:  Good morning, Your Honor.  Sandi Irwin and

23    Stephen Ganter on behalf of Nayef Qashou.

24          THE COURT:  Good morning.  And this is Mr. Qashou here

25    with you today?
```

1          MS. IRWIN:  Yes, Your Honor.

2          THE COURT:  Good morning.

3          THE DEFENDANT:  Good morning, Your Honor.

4          THE COURT:  Will the probation officer please identify

5    yourself for the record.

6          PROBATION OFFICER BRENDLE:  Brandi Brendle with

7    probation.

8          THE COURT:  Good morning.

9          PROBATION OFFICER BRENDLE:  Good morning.

10         THE COURT:  All right.  Ms. Irwin, since we have social

11   distancing considerations, you and Mr. Qashou can remain at

12   counsel table during the sentencing proceedings.  The government

13   attorneys as well.  No one will need to approach the podium

14   unless you need to present evidence or use the Elmo.

15         And we will -- you can continue to wear your masks

16   unless and until it becomes a problem understanding one another.

17   We want to make sure that our court reporter can get what you

18   say down accurately.  So if you would like to remove your mask

19   when you are addressing the Court in order to facilitate

20   communication, you may do so.

21         All right.  I understand we have a plea agreement in

22   this case, and that it is a binding plea.  Mr. Qashou has

23   pleaded guilty to Count 1 of the indictment, and the magistrate

24   judge accepted his guilty plea.

25         Mr. Nichols, will you please briefly summarize the

1 terms of the plea agreement.

2         MR. NICHOLS:  Yes, Your Honor.  Thank you.

3         Mr. Qashou has pled guilty to Count 1 under 18 U.S.C.

4 1001(a)(2), false statement to a federal agency.  The plea

5 agreement that we've agreed to is a Rule 11(c)(1)(C) plea.  The

6 agreement was for a sentence of time served -- it's roughly five

7 months -- with a maximum period of supervised release, to

8 include mental health treatment as prescribed by a mental health

9 provider.  Mr. Qashou also would waive his right to appeal.

10 There would be no additional charges brought.  If the plea is

11 accepted by Your Honor, the United States would dismiss Count 2.

12         I believe that's all, Your Honor.  Thank you.

13         THE COURT:  Ms. Irwin, do you agree with that summary?

14         MS. IRWIN:  Yes, Your Honor.

15         THE COURT:  All right.  I've reviewed multiple

16 documents in advance of this hearing.  I've reviewed the

17 indictment, the psychiatric reports, documents 20, 21, and 28,

18 the plea agreement, the addendum to the plea agreement, the

19 presentence report, probation's sentencing recommendation, the

20 sentencing memoranda, and the exhibits to the sentencing memos.

21         As to the issue of whether the Court should accept this

22 plea agreement, does the defense anticipate making any arguments

23 or presenting any further evidence?

24         MS. IRWIN:  If Your Honor is inclined to accept the

25 plea agreement, we won't find that necessary; however, if you do

1  think that it's necessary for us to present further evidence, we

2  would be happy to do so.

3       THE COURT:  All right.  What about the government?

4  Does the government anticipate presenting any evidence, making

5  any arguments about why I should accept the plea agreement?

6       MR. NICHOLS:  No, Your Honor.  We stand by our

7  sentencing memorandum and the recommendation here in the plea

8  agreement.  I guess if additional evidence were to be presented,

9  we may have some comment for Your Honor or some additional

10  evidence, but I don't anticipate that.

11       THE COURT:  Well, I don't prerule.  So if you have

12  something that you would like to present to support your plea

13  agreement, you may certainly do so.  I'm happy to rule on the

14  evidence that you've presented thus far if you want to rest on

15  that, but it's your case.  It's up to you whether to present any

16  evidence on the issue of the plea agreement.

17       MS. IRWIN:  We would like to present evidence, Your

18  Honor.

19       THE COURT:  All right.  Go ahead.

20       MS. IRWIN:  I'd like to call Asma Qashou, please.

21       THE COURT:  Is this sworn testimony or just a

22  statement?

23       MS. IRWIN:  We would like to present sworn testimony.

24       THE COURT:  All right.  Let me see.  For her to take a

25  seat in the witness box would be fine.  I think that we would --

1  we're large enough to have social distancing in that regard.

2         So if you would, Ms. Qashou, please come forward and be

3  sworn by the courtroom deputy.

4                        ASMA QASHOU

5     The witness, having first been duly sworn to speak the

6  truth, the whole truth and nothing but the truth, testified as

7  follows:

8                    DIRECT EXAMINATION

9  BY MS. IRWIN:

10  Q.  Good morning, Ms. Qashou.  Would you please say and spell

11  your first and last name for the record.

12  A.  Yes.  My name is Asma Qashou.  A-S-M-A, Q-A-S-H-O-U.

13  Q.  And how are you related to Nayef?

14  A.  I am his mother.

15  Q.  And how many children do you have all together?

16  A.  I have four children.  Three boys, one girl.

17  Q.  And where does Nayef fall?

18  A.  He's the eldest.

19  Q.  He's the eldest?  How old were you when you had Nayef?

20  A.  I was 19.

21  Q.  19.  And how was Nayef as a baby?

22  A.  He was a perfect child.  He was a good child.

23  Q.  And in grade school, how did he do?

24  A.  He did great.  Marvelous.  He did above average, and he was

25  loved by all his teachers and his classmates and everyone.

1  Q.  What were his plans after high school?

2  A.  Well, he had many plans.  He wanted to become a professional

3  basketball player, he wanted to become an engineer and, like, do

4  something for the world, you know.  Different kind of engineer,

5  like environmental or something.  He's so fascinated with things

6  that will help the environment and humans.

7  Q.  And did he go to college?

8  A.  He did.  He tried.  Actually, he tried many times, but

9  unfortunately, he's still trying.

10  Q.  Could you tell us about the first time that he went to

11  college.

12  A.  Yes.  That first time he went to college, when he graduated

13  high school, he got scholarship, and he attended UAB to study

14  pre engineering.  But from the first semester, he could not take

15  it.  He just, you know, dropped his classes, and he asked to

16  come back home.  And maybe -- I'm not sure why.  Because he was

17  homesick or something, he just couldn't take maybe the pressure

18  of being away from us.

19  Q.  And when you say UAB, do you mean the University of Alabama

20  at Birmingham?

21  A.  Yes, ma'am.

22  Q.  And where were you?  You said that he wanted to come home.

23  Where were you living when he --

24  A.  We were living in Saudi Arabia, where his father was

25  working.

1  Q.  And did he return home after that semester?

2  A.  He did.  He did before -- yeah.  Before the semester ended,

3  he dropped his classes and he came back.  Yes.

4  Q.  And what happened next?  Did he go to college again?

5  A.  He did.  He did.  He did go to college again.  Because at

6  the beginning, you know, we tried to understand why and stuff.

7  And we believed in Nayef, you know, because we know he always

8  has a vision to do something for this world.  And we kept

9  encouraging him.  We could not understand why he dropped his

10  classes and he came back, but -- so we encouraged him to go to

11  college again.  And we went ahead and signed him up for another

12  college where we used to live.  And he started, but, again, you

13  know, he could not -- he did not like the way they were teaching

14  there or maybe he could not take the system or something.  I'm

15  not sure what happened.  He could not finish what he was doing.

16  He couldn't.

17  Q.  And did he eventually move back to Alabama?

18  A.  Yes.  He moved -- well, finally he moved back here because

19  his brother was living here, my second son.  He was going to

20  Auburn.  So we encouraged him.  We said maybe in the states, you

21  know, there is more opportunities, people who understand, you

22  know, what you want to do there and stuff.  So we encouraged him

23  to come and stay with his brother and just go to a junior

24  college and hopefully, you know, maybe progress from there.  And

25  so that's what has been happening.  And he has been taking few

1  class and trying to establish, you know, himself and try.  So --

2  Q.  And how soon after moving back to Alabama to live with Adam

3  did he start having interactions with the FBI?

4  A.  I think from the first day he was in the airport, they just

5  started to questioning him.  You know, from the first day they

6  questioned him.  And that's it, you know.  They kept on through

7  all that time, you know.  I think -- I mean, Nayef doesn't

8  really share with me details and stuff.  He's just that kind of

9  a child.  He's close.  Sometimes he doesn't bother maybe, you

10  know, to share.  Maybe he doesn't want to bother me with

11  anything, but whenever I ask him how are you and stuff, he says,

12  I'm fine.  I'm fine.  But I know he's not fine, because having

13  all these, you know, questioning and -- and Nayef is the kind of

14  person who doesn't like people to know anything about his life.

15  Even I'm his mother, you know.  He's not -- he's private, you

16  know.  He doesn't like people to know much about his life.

17  Q.  Did he start school again once he relocated to live with

18  Adam?

19  A.  He started, yes, at Southern Union.  Again, he had plans.

20  One time he -- we keep encouraging him, you know.  We want --

21  you know, like I said, we believed he's going to be something.

22  He's going to change, you know, the world, you know.  So we kept

23  encouraging him, again, you know.  But we told him, study

24  whatever you think you can do, your passion or whatever.

25      So he took general classes.  One time he said he wanted to

1  be a nurse.  Sometimes I want to be a teacher.  So he started

2  taking classes.

3      And then he finally came to the point he wants to have his

4  own business.  So that's why he switched to business, and that's

5  why he transferred to Auburn University and started taking

6  classes there.  And that's when he was arrested, you know --

7  Q.  And that --

8  A.  -- in the middle of fall semester.

9  Q.  I know that when he started -- or when he relocated to

10  Auburn, you were still living in Saudi Arabia --

11  A.  Yes, ma'am, because I had other children, yes, and I had to

12  stay with my husband.  But he was old enough to be with his

13  brother.  Yeah.

14  Q.  And where do you live now?

15  A.  He's living with me in the house.

16  Q.  Where are you living now?

17  A.  We live in Auburn.

18  Q.  And when did you relocate to Auburn?

19  A.  Last year in July of 2019.  And one of the main reasons is

20  just, you know, to help Nayef out.  Because, you know, just

21  having him not moving forward and his future is on hold and

22  stuff, so we said -- even though his dad is still in Saudi

23  Arabia, I said, let me take this opportunity and relocate to

24  help him out and support him because after what's happening,

25  what has been happening, to him.  So --

1 Q. Did you feel that Adam needed some more support?

2 A. Adam is fine, actually. He's okay. Of course, he would

3 love to have the family with us. Adam tried, but he could not

4 do much, you know. He could not probably help him much. So

5 that's why he said Nayef needs his other siblings to help him

6 and be with him. And he's a kind of loving guy, you know, he

7 likes to be around family, and he could not be with us because

8 he couldn't travel. He could not be with us.

9 Q. So to clarify, who relocated here to Auburn in July of 2019?

10 A. Myself and my other two siblings -- sorry -- my other two

11 kids. I have Sarah, who is 17 now. She's in high school. And

12 I have Laith (phonetic), who is ten years old. He is going to

13 middle school in a month. Yes, ma'am.

14 Q. And did you have concerns about why Nayef was not doing well

15 in school prior to you coming here?

16 A. Of course, you know, all consequences. And I kept

17 researching also on the internet, you know, why people, you

18 know -- someone who knows Nayef, you now, he's the kind of child

19 who's a disciplined child. Why is he not moving forward?

20 What's holding him from moving forward, you know? Because we

21 knew he could be something.

22     And I tried to search, maybe he's going through depression

23 or going through something, you know. I'm sure, you know, with

24 all of having -- it just -- he needed our help. But I could not

25 know exactly what's going on.

1    I mean, we tried to test him when he was in Saudi Arabia,

2  because, you know, we did -- all the time teenagers,

3  adolescents, go through stages.  But unfortunately, over there,

4  they could not -- they said Nayef is fine.  Everything is fine.

5  They could not find anything.

6  Q.  I want to make sure that I understand what you're saying,

7  that you did have him tested at some point in Saudi Arabia.

8  What specifically were you having assessed?

9  A.  I took him to a psychologist or psychiatrist there.  I said,

10  I just want to know why my son is not progressing in school, you

11  know, what's going on with him.  And --

12  Q.  I apologize.

13  A.  Over there, the culture is different, you know.  I don't

14  know.  They just -- Nayef also, he said, I don't need to see

15  anyone.  And over there they did do some testing, like MRI, CT

16  scan, whatever.  It could not show anything.  But like I said,

17  you know, they said he's fine.  Maybe he needs to take medicine

18  or whatever.  But we did not really follow that.

19    After that, maybe a month or two, he came to the U.S.  And

20  we said, let's see, maybe when he changed the environment he's

21  in, maybe when he's older now, maybe he's more mature.  I don't

22  know.  But he kept, again, you know, signing up for classes.

23    He did -- at some point did okay at Southern Union.  Of

24  course, he had some needs.  He wanted to have a family, he

25  wanted to get married and stuff, but, you know, certain things

1   held him, you know, from completing his needs.  Like I said, you

2   know, not knowing what's going to happen for him from all these

3   questioning and what's going on.  Yes.

4   Q.  And at some point in the future, at some point did you learn

5   that he did have some sort of mental health disorder that had

6   not been addressed?

7   A.  Yes, ma'am.  Yes, ma'am.  Exactly.  From these assessments

8   that you guys requested and the government requested, it did say

9   something.  And that's why now he's seeing therapy.

10  Q.  And what did you learn from those assessments that we had

11  completed?

12  A.  That Nayef has some kind of autism disorder.  Yes.  And he

13  needs to be looked at, and he needs to be followed.

14  Q.  And you mentioned that he was getting therapy for this?

15  A.  Yes, ma'am.

16  Q.  When did that start?

17  A.  Since he was released and we started -- you know, contacted

18  the counselor, psychologist, and she started working with him.

19  And so far, it's working.  It's working good.

20  Q.  How often does he see the counselor?

21  A.  He started with once a week, and now twice a week -- sorry.

22  Once a week, now twice a month.  So biweekly.

23  Q.  And you said that it's helping.  What do you mean by it's

24  helping?

25  A.  You know, I'm sure she's talking with him about his plans,

1  trying to change, you know, his -- maybe trying to help him out,

2  you know, adjust, and maybe go through this obstacle in his

3  life.  Sometimes she gives him assignments, you know, to look

4  into his future, you know, for example, the future wife that you

5  want.  If you want to go to school, what do you want to be?

6  Just trying to maybe start a conversation with him and trying to

7  find out, you know, how will he move or progress forward.

8  Q.  And you talk about how your life has changed since you've

9  learned about this diagnosis about --

10  A.  Of course.  Of course.  Just -- before I -- before -- like

11  as a mother, you know, I may get mad or upset, because he's not

12  moving forward.  But now I understand, and I feel sorry for

13  maybe if I got mad at him or something.  Because I wasn't sure,

14  you know, what was going on.  Was it laziness?  What was exactly

15  going on with him?  But now I understand, you know, with all

16  these disorders, sometimes it's not up to you, it's up to the

17  brain, you know.  And you just can't help it.  You know, we just

18  have to help him out, you know, get the right treatment and

19  hopefully, you know, change everything and have a bright future

20  for him.

21  Q.  What does that bright future look like to you?

22  A.  Like maybe being able to have a family, focusing, having a

23  job, being able to be independent on his own, and just be happy,

24  you know.  Just have a happy future like everyone else.

25  Q.  Finally, could you share a little bit about how you feel

1  about Nayef.

2  A.  Nayef is my eldest child, like I say, and I love him so

3  much.  And I shouldn't say that, but probably he's -- he's very

4  dear to me.  I love him so much more -- I feel sorry for him

5  sometimes more than his other siblings, because I see that Nayef

6  didn't have a normal teenage.  He never got upset.  He never

7  cusses.  He's different.  He's just different from anyone else.

8      I just wish for him the best, and I hope -- it breaks my

9  heart to see him this way.  And I hope for him, you know, to

10 have a bright future and just be happy, you know.  I want him to

11 be happy.  That's all I'm looking for.

12         MS. IRWIN:  I have nothing further for this witness,

13 Your Honor.  Thank you.

14         THE COURT:  Any examination by the government?

15         MR. NICHOLS:  No, Your Honor.  Thank you.

16         THE COURT:  You can step down.  Thank you.

17         Ms. Irwin?

18         MS. IRWIN:  I'd like to call Amjad Qashou.

19                     AMJAD QASHOU

20     The witness, having first been duly sworn to speak the

21 truth, the whole truth and nothing but the truth, testified as

22 follows:

23                   DIRECT EXAMINATION

24 BY MS. IRWIN:

25 Q.  Good morning, Mr. Qashou.

1  A.  Good morning.

2  Q.  Would you please state and spell your first and last name

3  for the record.

4  A.  Yes.  My first?  A-M-J-A-D.  Last name is Qashou,

5  Q-A-S-H-O-U.

6  Q.  And how are you related to Nayef?

7  A.  I'm his father.

8  Q.  And how are you related to Asma?

9  A.  She is my wife.

10  Q.  And can you tell us, when Nayef was born, what were your

11  hopes for his future?

12  A.  Nayef was born 23 March 1994.  At that time I was having a

13  job in Abu Dhabi in UAE at that time, you know.  And I was

14  hoping for his future nothing but the best, you know.

15  Q.  What did you see him doing in the future?  What did you

16  think your son would do?

17  A.  I was working very closely with Nayef.  You know, my dad was

18  a math teacher for 44 years, so I was working with Nayef on his

19  math, on his science, and things like that.  And he did really

20  very well on his SAT scores.  That's why he's got scholarship at

21  UAB at that time, you know.  So that's about it, you know.  My

22  background is educational, so that's what I'm good at, you know.

23  Q.  So did you expect that he would do something with math?

24  A.  Definitely.  Yes.  That's my wish, you know.

25  Q.  And in high school, what did Nayef want for his future?

1  A.  Nayef, like his mom said, he had, you know, big hopes, you

2  know.  But we noticed that he keeps changing.  It's not the

3  same.  One day he would say, I want to be a basketball player.

4  One he says he wants to be a farmer, you know, something like

5  that, you know.  At one time he spoke to me about some petroleum

6  engineering, you know.  I mean -- so like his mom said, we tried

7  to work with him, you know, to accommodate his -- but, you know,

8  again, you know, I'm focused on education only.  Nothing else.

9  Q.  And so how did it make you feel when he was talking about

10  being a basketball player one day and a petroleum engineer the

11  next?

12  A.  I did not mind, I mean, as long as it moved him forward in

13  the right direction, you know.  But, you know, like his mom

14  said, you know, it's hurt our feelings to see it was not moving

15  the way he wanted it to, you know.  So we were really totally

16  surprised, you know.  But we did not know what was happening,

17  you know, in his life.  So --

18  Q.  And we heard that he attended University of Alabama at

19  Birmingham.  Were you financially supporting him while he was at

20  college?

21  A.  Yes, ma'am, I did.

22  Q.  And how did you view him leaving school early to come home

23  after less than a semester?

24  A.  Oh, to me it was a big disaster.  I mean, I was totally

25  shocked.  I mean, it is just -- I cannot describe even how it

1  was, you know.  So --

2  Q.  Did you have concerns regarding his mental health?

3  A.  Oh, yes.  I mean, definitely.  I mean, when he kept dropping

4  out, dropping out, we thought something is wrong, you know.

5      So we took him to physicians, you know, back where I'm

6  working right now.  But unfortunately, they could not locate

7  or, you know, diagnose actually what was happening, you know.

8  So --

9  Q.  And most recently, Nayef has been attending college in

10  Auburn, Alabama; is that correct?

11  A.  That's correct.  Yes, ma'am.

12  Q.  And he was living with his brother Adam?

13  A.  Yes?

14  Q.  And were you financially supporting Adam and Nayef?

15  A.  Yes, ma'am, I was.

16  Q.  And can you explain how the finances were run in that

17  household when it was just Adam and Nayef.

18  A.  For me, what I've done, I made the connection between my

19  bank account and their bank accounts and, you know, I was just

20  giving them enough money to support their school.  If they want

21  to buy a book or pay for tuition, that was it, you know.  But I

22  don't pay extras for anything because I have a big family that I

23  need to support as well.  So I was giving them enough money just

24  to sustain them, you know, like rent, food, things like that,

25  you know.

1  Q.  And if Nayef wanted some money, did he come to you to ask

2  for money?

3  A.  Yes, he would call me or message me, like, I want to buy a

4  couple of books, I want to pay tuition, you know.  And he would

5  show me the proof, and I'll give him the money, and he would pay

6  to the college, you know, immediately.

7  Q.  And in his household in Auburn, do you know who controlled

8  the finances?

9  A.  Adam was the main one because he was there; but -- you know,

10  they were both independent, but I had them both tied to my bank

11  account and I was watching every day what was -- how much they

12  are spending.

13  Q.  And when you learned that Nayef was having contact with the

14  FBI, what were your thoughts about what was going on?

15  A.  Well, at the beginning, even, the FBI spoke to me.  And I

16  was happy they spoke to me because, like my wife said, we were

17  happy that he came back to this country.  I mean, one of the

18  main reasons was I was anxious about the job in Saudi.  It's a

19  good investment for him in this country.  And that's why we went

20  there, because he could pick up other language, other cultures

21  and things like that.  So, you know -- so we were happy, you

22  know, about that, what was happening.

23      Could you repeat the question one more time, please?

24  Q.  You answered my question.

25  A.  Okay.  Sure.

1  Q.  Could I ask another question?  I'd like to ask how you felt

2  when he was arrested.

3  A.  Personally I was devastated because -- mainly of the timing.

4  You know, I mean, he was in the middle of the semester.  And the

5  semester before, he was out, even though I disapproved his

6  outage, you know, out of college.  I wanted him to focus on

7  college.  Like his mom said, maybe he couldn't do it for some

8  reason we didn't know.  So that's why one of the main reasons

9  we're happy to come here is probably to present him to some

10  physicians here.  We know that, you know, here, you know, there

11  is much more capabilities than abroad.

12  Q.  And did that happen?  Did he meet with physicians here that

13  helped you learn what is really going on with Nayef?

14  A.  Well, his mom kept trying, but like she said, he was saying,

15  there's nothing wrong with me, and we were having tough time to

16  convince him to see someone.  But she keep after him, you know,

17  all the time.

18  Q.  And did you at some point learn that he did have a diagnosis

19  of a neurological disorder?

20  A.  Yes.  And I really appreciated that from the government and

21  from everybody.  I really thought that was, you know -- I know

22  it's bad news for us, but in reality, it's good news.  At least

23  we know what the problem is so we can treat it, you know.

24  Q.  When did you learn of that diagnosis?

25  A.  Back in September when I came here to court, I think, and I

1 met -- I forgot -- Dr. Boyer.  I forget his name, but I thought

2 he gave an excellent assessment at that time.

3 Q.  And did you learn at any point that he had autism disorder,

4 autism spectrum disorder?

5 A.  Yes, ma'am, at that time, September 2019.  That was the

6 first time.

7 Q.  And how has this diagnosis impacted your family?

8 A.  It impacted it a lot.  I mean, now we really -- like his mom

9 said, I used to get very upset with him, but now, you know, I'm

10 holding my horses.  I say, now, wait a minute.  I'm having

11 second thoughts, you know.  We're trying to work with him, you

12 know, right now.  In fact, he asked me -- he wants to get

13 married a few times, I told him, well, let's fix -- you know,

14 let's fix you up first before, you know, about moving forward,

15 you know.

16            MS. IRWIN:  I have nothing further, Your Honor.

17            THE COURT:  Anything from the government?

18            MR. NICHOLS:  Yes.  Ma'am, thank you.

19                          CROSS-EXAMINATION

20 BY MR. NICHOLS:

21 Q.  Mr. Qashou, I think you mentioned that Adam kind of

22 controlled some of the finances.  Adam is younger than Nayef;

23 correct?

24 A.  That's correct.  He's two years younger than him.  Yes, sir.

25 Q.  Two years younger.  Can you clarify more as to who was

1 really kind of in charge of that household?  I mean, was Adam

2 kind of making the decisions about money and about what they do

3 with the house or the apartment and things like that, or were

4 they both doing it jointly?

5 A.  No, sir.  That's exactly what I meant.  Because Adam was

6 situated here and Nayef was with us in Saudi, so everything was

7 in Adam's name, you know.  The bills, the rental and all of

8 that.  So Adam was doing that, you know.  And I think also I

9 bought them a little car so they could commute and buy their

10 groceries.  So Adam was -- you know, he had the insurance and

11 things like that.  So he was paying for the main things, Adam,

12 and I was giving Adam all the money to buy the groceries and

13 things like that.  But for Nayef, I was giving him enough money

14 just for schooling.  So he did not have much control of

15 finances, Nayef.

16 Q.  Adam took care of, really, everything --

17 A.  Yes, sir.

18 Q.  -- except for Nayef's direct payments to school?

19 A.  Yes, sir.  Exactly.

20 Q.  Adam was doing grocery shopping?

21 A.  Correct.  Yes, sir.

22 Q.  Making sure the car was taken care of --

23 A.  Yes, sir.

24 Q.  -- properly --

25 A.  Insurance.  Exactly.

1  Q.  -- and things?

2  A.  Yes.

3  Q.  Why did you feel that Adam needed to do that, even though he

4  was two years younger than Nayef?

5  A.  Well, again, because Nayef, you know -- you know, he was

6  dropping out of school and things like that, and he was new, you

7  know.  He came -- I think Adam came 2014.  So Nayef came almost

8  two years after that.  So Adam is the one who was really up to

9  speed and Nayef was just a beginner here, you know, that kind of

10  thing, you know.

11  Q.  Okay.  You still live in Saudi Arabia; correct?

12  A.  That's correct.

13  Q.  Do you have any plans to move back here?

14  A.  You know, as long as I have a job there, probably, you know,

15  to support the family, because it's kind of expensive, you know,

16  to -- to support.

17  Q.  And what is your family's plan as far as staying in the

18  Auburn area?

19  A.  Actually, we love it.  And we want to live peacefully, like

20  my wife said, like, you know -- like I said.  And I'm hoping to

21  nurture this family in this country.  This is a great place.  I

22  went to school here, and I know how it treats, like, you know.

23  Q.  You and your wife both went to Auburn; correct?

24  A.  I did.  My wife, she attended -- you know, I had a job after

25  Auburn in Durham, North Carolina, so she attended college over

1  there at that time.

2  Q.  Oh, okay.

3     But to get back to it, is the rest of your family planning

4  to stay and live in Auburn with Nayef?

5  A.  Yes, sir.

6  Q.  Okay.  There's no plans for everybody to move back to Saudi

7  and leave Nayef here?

8  A.  No.

9  Q.  Okay.

10  A.  No.

11  Q.  Have you had any interaction with Nayef's mental health

12  provider that he sees now?

13  A.  I did only with -- when I saw him that day.  And actually,

14  unfortunately, after that hearing, I had to leave back -- you

15  know.  And actually, the reason I'm here is because there are no

16  flights.  Otherwise, you would not see me here.  I came just for

17  a couple of weeks, vacation, but I got stuck, you know, because

18  of -- you know, there is a halt on flight right now.

19  Q.  Okay.

20  A.  Right.  But as soon as there's flight, I will go back, you

21  know.

22  Q.  Do you think that you and your family are able to help Nayef

23  and make sure that he is able to follow the Court's rules if

24  he's put on supervised release?

25  A.  One hundred percent.  Yes, sir.

1  Q.  Okay.

2  A.  Yes, sir.

3  Q.  Now, I know that in the past when Nayef was moving back to

4  the United States to attend Auburn or Southern Union, you

5  entered into a contract with Nayef; right?

6  A.  Well, that was like a man, you know, father thing.  I mean,

7  because I told him for me to make a commitment for you to go

8  back, I want you to do the following, you know.  And I did not

9  like some of his habits, like, for example, he stays a bit late.

10 I told him to go to sleep early, things like that.  So that's

11 what I wrote in the contract.  I need you to sleep.  I need you

12 to have a couple of good friends.  I want you to eat food

13 normal.  He likes to eat, you know, in a specific way.  I told

14 him, just join the family.  So it was just normal things, you

15 know.  But unfortunately, I don't think he followed it much

16 because of this issue of mental, which we were not sure about,

17 you know.  So --

18 Q.  Obviously, you were concerned about whether he was taking

19 care of himself and making good decisions.

20 A.  Yes, sir.  Exactly.

21 Q.  And that was your attempt at that time --

22 A.  That's exactly.  Yes, sir.  Nothing more.  Yes.

23 Q.  Your attempt at that time to try to help him stay on the

24 right track.

25 A.  Exactly.  Exactly.  Yes, sir.

1  Q.  Wasn't there a portion in there also that discussed radical

2  ideology?

3  A.  Yes, there is.  Because sometimes, you know, he puts

4  something in focus.

5      Like, you know, for example, in our belief, you know, you

6  should not pray if there is a picture in the room.  If there is

7  a picture, then you say, I'm not going to pray.  I said, forget

8  these things, you know.  So issues like this, silly things, I

9  told him, don't look at these things.  Just move on with your

10  life, focus on the main thing, your education, your future, but

11  don't focus on these things.  That was my intention.

12  Q.  Would you say that he became obsessed with those more

13  specific and more conservative forms of Islam?

14  A.  Not really.  I mean, just -- I mean, as a believer, you

15  know, it's really all silly things.  It's really -- it's not

16  some of the main beliefs.  That's what I -- because to me, it

17  gave me a vision that he's focusing on side tracks, not the main

18  item.  So I told him, don't focus on these little things, you

19  know.  And that's what I told the agents when I spoke to them.

20  Same thing.  Yes.

21  Q.  Do you know where he got those ideas from, where he -- why

22  he started focusing on those things that are outside of what

23  your family focuses on?

24  A.  Good question.  Actually, Nayef, he had a good friend when

25  we were in Saudi Arabia.  He's from India.  He's not Muslim.  I

1   forget what is his religion.  And then that guy, his dad died,

2   so the family had to -- at that time Nayef became shocked, you

3   know, because he lost a dear friend to him.  So he started being

4   obsessed by reading and, you know, seeing things -- from that

5   moment, you know, I could tell, you know, that -- but he kept

6   focused at school at that time, you know.  So -- yeah.

7   Q.  So he just seemed to be focusing in on that and outside

8   of -- and not focusing on the things that you wanted him to

9   focus on?

10  A.  Well, he did, but not, you know, 100 percent, you know.

11  Like I said, these silly things seemed to distract him, you

12  know, once in a while.  So I kept bringing him back, like, you

13  know, you should focus on the main aim, you know.

14      But, again, I don't have much medical knowledge, you know,

15  but I did not know nothing about this medical case which we just

16  found out recently, you know.

17  Q.  Your family does not subscribe to those types of --

18  A.  Oh, no, sir, no.  We just moderate people.  No, nothing.  I

19  come from family, you know, my brothers and sisters all are

20  engineers and physicians.  You know, we don't have time for

21  these things, you know.  Even this social media, I don't have

22  much knowledge about it and all that.  I don't have time.

23  Q.  Have you talked to Nayef about his feelings about that now,

24  about those beliefs that he held previously?

25  A.  I do once in a while when I get the chance, you know.  But

1 Nayef is the kind of person, he's very private, you know.

2 He's -- he gets bothered if you push him too much. So I try to

3 choose the right moment, and I do talk to him, yes. I mean, any

4 opportunity I get, I do talk to him.

5 Q. Has he shown indications to you that he still wants to

6 follow those more radical beliefs?

7 A. Oh, no, no. He changed a lot. He changed a lot, you know.

8 Q. Okay.

9 A. He's changing.

10 Q. Do you have any specifics?

11 A. You know, when I came back -- actually, I came back -- back

12 in March when I came here, that's when this pandemic started and

13 all of that. And since he was confined at home, I told him to

14 start, you know, looking for a job and things like that. So he

15 said, I'm not allowed to go out of the house. I told him, why

16 don't you buy and sell stocks? I mean, just something, you

17 know. Things like that, you know.

18     So he showed some interest that, you know, in things like

19 that. And then he started talking again about this marriage

20 thing. So I told him, marriage is a big commitment. If you

21 want to get married, you know, you need a house. You need so

22 many things. So he showed interest to these things, which, you

23 know --

24     But, again, you know, before -- you know, I give you an

25 example. When he used to go to prayer, he will spend one hour.

1  Now he will spend two minutes, and he will just move on.  So he

2  changed a lot.

3  Q.  Okay.  Have you seen any of those things like the picture

4  issue that you talked about?  Is that still happening?

5  A.  He's not looking that way anymore.  No.

6  Q.  And just for -- and, again, this is not about you, but I'm

7  just -- just for comparison's sake.  How long would you spend

8  normally at prayer?

9  A.  Me?  I am very moderate guy.  Just two, three minutes, I'll

10  be done with all of it, you know, so --

11       MR. NICHOLS:  May I have just a moment, Your Honor?

12       THE COURT:  Yes.

13    (Brief pause in the proceedings)

14       MR. NICHOLS:  That's all, Your Honor.  Thank you.

15       THE COURT:  Any redirect?

16       MS. IRWIN:  No, Your Honor.

17       THE COURT:  All right.  You may step down.  Thank you.

18       MS. IRWIN:  May I have one moment, Your Honor?

19    (Brief pause in the proceedings)

20       MS. IRWIN:  I have no further testimony to offer, Your

21  Honor.

22       THE COURT:  All right.  Ms. Irwin, let me hear from you

23  as to why I should accept this plea agreement.

24       By my calculations, it would represent a 16-level

25  variance or departure from the guideline range.  Let me hear

1  from you about why that's appropriate.

2      MS. IRWIN:  It's appropriate for several reasons, Your

3  Honor.  First of all, this is an agreement that was crafted

4  between Nayef and the government.  Together we determined what

5  was best in Nayef's best interests.  We still assert that that's

6  true.

7      At the heart of this is a disorder that has been

8  identified in Mr. Qashou, and that is autism spectrum disorder.

9  He has a very mild form, and it's something that might have once

10  been labeled Asperger's syndrome, but today he's ASD level 1.

11      And it's difficult, I think, to understand how that

12  plays into this without understanding a little bit about how

13  someone with ASD navigates the world.  So if you'll permit me, I

14  would like to explain a little bit.

15      I lost my best friend over an e-mail.  It was someone I

16  had known very well in college.  We stayed friends after

17  college.  We had inside jokes and nicknames and little phrases

18  that had subtexts.  But at some point, we lived in two different

19  time zones, and most of our communication was by e-mail.  And in

20  one e-mail that -- in fact, I introduced her to her husband

21  through e-mail.  But there was one e-mail that we exchanged in

22  which I thought I was expressing love and support for her, but

23  when she read it, she read it as judgment and criticism.  And I

24  wasn't able to repair that.

25      And I realized very quickly that what had happened was

1  that all of the nonverbal cues that all of us use every day to

2  understand what someone is saying weren't present.  She couldn't

3  see my face, so she couldn't see me facial expressions.  She

4  couldn't see my body language.  She couldn't even hear my tone

5  of voice.  And I think this is the best way for me to understand

6  what it's like for someone with autism spectrum disorder to

7  navigate the world.

8           Later -- this was a long time ago that this happened --

9  now we have emojis and we have text speak, and we give people

10 little cues into what we're thinking.  But someone like Nayef

11 walks around in the world without those emojis and without the

12 LOLs.  And so it's difficult to know when someone's telling a

13 joke, if you are the butt of that joke, are they laughing at you

14 or laughing with you?

15          It's difficult to assess from the context, whether it's

16 clothing, expressions, location, whether something is a

17 propaganda video or whether it's our own government's criticism

18 about a humanitarian crisis that you view.  And it also means

19 that he doesn't use the typical ways of expressing emotion or

20 conveying what he really feels about something.

21          And you've heard his parents both say that he's very

22 quiet and very private.  And this is likely due to the fact that

23 over and over and over again, he has tried to express himself in

24 a way that is understandable to everybody around him, and they

25 simply haven't been able to get it.

1    We have hours of audio and video recordings of FBI

2  interviews with Nayef, and we have pages and pages of records.

3  Thousands -- maybe ten thousand pages.  And one theme that

4  recurs throughout those is Nayef saying, but you don't

5  understand who I am.  The videos that you're talking about don't

6  represent me.  The things that you're hearing are not what I'm

7  saying.

8    And he made attempt after attempt after attempt to

9  clarify for the FBI who he was.  He would give them papers that

10  he wrote for school in the hopes that that would help them to

11  understand.  And he would spend time very carefully showing them

12  videos that he thought represented him.

13    And in fact, in February of 2019, he had a very long,

14  five-hour interview.  And one of the things he asked for the

15  agents involved to do was to watch a video.  And that video

16  was -- it was a brief YouTube video, and it really talked about

17  America's disillusionment with institutions that it had once

18  depended on:  The United States Government.  Institutions of

19  education.  That these were all things that people believed were

20  supporting them, and that they had lost some of that along the

21  way, but that there was still hope that that could be regained.

22    And at the end of this, the agent said, okay.  Well,

23  that was an interesting video.  How do you think this represents

24  you?  And Nayef spoke of the hope that was in that.  But more

25  specifically what he says is, even if you just were to -- if you

were to just take one picture from that video, that, like,
really -- I feel like really represents me, it would be that
picture that had the -- the one where the -- where the -- where
the man was holding the umbrella over the old lady. If you were
to have just one picture that represents me, that would be it.

Nayef is a person -- you heard his parents tell you --
a person who wants to change the world for the better. You read
letters from his siblings where they tell you that he wouldn't
even harm an ant that's in their home. He would insist that
someone take it outside. And you saw a video where he talked
very much about what he wanted for the future. And repeatedly
what he said was, I want to help people.

The Court has an opportunity to help Mr. Nayef Qashou
reach that goal of helping people. By accepting this plea, you
give him the opportunity to go to therapy so that he can learn
to navigate in this world where the rest of us understand what's
being said, the subtexts and the contexts, not just the little
words, but really understand what someone is trying to
communicate. And that therapist will help him get the skills
that he needs to also express himself in a way that will avoid
miscommunication and confusion and misunderstanding like what
led to these charges.

And I don't want to minimize autism spectrum disorder
as just a communication problem, because it comes with other
things. There are organizational difficulties that make it

1  difficult for someone like that to live on their own.  And what

2  ends up happening is they become very comfortable with rules.

3      Nayef is still comfortable with rules.  He's conformed

4  with every single one of the conditions of his release up to

5  now, and there's no reason to believe that he will not continue

6  to do the same.

7      Nayef is that man holding the umbrella over someone's

8  head.  He should be given a chance to continue to do that.

9      THE COURT:  Mr. Nichols?

10     MR. NICHOLS:  Thank you, Your Honor.

11     This was a long investigation.  The FBI put a lot of

12 time and effort into this case, trying to understand what

13 Mr. Qashou was intending, what he was all about, why he was

14 doing the things that he was doing.  And a lot of it was

15 confusing.  You know, they could tell during the investigation

16 that something seemed off.  They couldn't tell why.  But at the

17 same time, it is true that he was breaking laws.

18     Because of that confusion, that's why we sought

19 immediately after his arrest -- and I reached out to defense

20 counsel and we started working immediately to try to get him

21 evaluated to see what was going on.  I didn't know what the

22 answer was going to be.  And I think there still are some -- I'm

23 not sure that we're still completely to the bottom of what all

24 is going on with him.

25     You know, the diagnosis -- the rule-out diagnoses and

all the things that were in all three reports, and they seemed
consistent to me, showed that it does appear he's somewhere on
the autism spectrum and that there's, you know, something that's
not clicking right.

You know, again, it's true that Nayef broke the law.
He subscribed to following a horrible organization. And we
don't want it to seem like we're dismissing or diminishing that
behavior. But we do think that he is different than a lot of
I'd say the majority of similarly situated people that we are
prosecuting in this country for the same type of behavior,
again, because of his mental health difficulties and concerns.

It appears that for one, ISIS or the Islamic State has
a very, very adept, very polished PR campaign, or they did
during that time. It is not surprising that people believe the
information that they're putting out there. And it is not true,
but they do a really good job of making it seem like it is.

Now, that's not a defense to following an organization
that is a foreign terrorist organization, but it should be noted
that that is true. And for someone like Mr. Qashou, it seems
like he had a harder time than most being able to determine
what's true and what's not.

And it seems to me, after being involved in the
investigation for two years and in reviewing all the materials
and all the statements that he's made, that there's a disconnect
between what ISIS really was and what Mr. Qashou thought they

1  were and what he thought he would be able to do for that

2  organization.  And he did say over and over that he wanted to be

3  a humanitarian.  ISIS is not a humanitarian organization, but

4  their PR campaign says they are.  So it appears that he

5  subscribed to that.

6          I still don't fully understand the way Mr. Qashou

7  thinks or why he did the things that he did, even knowing that

8  what he was doing was wrong.  It doesn't make sense to me.

9          But the bottom line, as I said in our sentencing memo,

10 is that if we're looking at how to do justice in this case,

11 which is, obviously, our number-one priority, sending this man

12 to prison for -- we're looking at 57 to 71 months -- is probably

13 not the way to do justice and not the way to protect the

14 American people the best way and not the best way to handle this

15 case.

16          He doesn't appear to be -- and, again, from a long

17 investigation, he doesn't appear to be a danger to the people of

18 this district or the people to the United States and on American

19 soil.  And it is true that during our investigation our biggest

20 concern was that he was going to go leave the United States and

21 join the Islamic State.  We just feel that he probably -- the

22 best way to ensure that he -- the best way to ensure the safety

23 of the United States, of the people of the United States and

24 this district, is to try to help him.

25          THE COURT:  He's being charged with making a false

1  statement to a federal agency.

2          And Ms. Irwin, I'll give you an opportunity to speak to

3  this, too.  When I'm hearing arguments about his diagnosis --

4  and I think it's a rule-out diagnosis; correct?  That it can't

5  be ruled out?  Maybe at least one physician had found that he

6  was on the autism spectrum, and the others found that they

7  couldn't rule it out; is that correct?

8          MR. NICHOLS:  That's correct, Your Honor.

9          THE COURT:  Okay.  And he's not being charged with

10  terrorism, he's being charged with making a false statement to a

11  federal agency.  So explain to me, then, why a 16-level

12  departure or variance for lying to law enforcement or for lying

13  to the FBI is warranted in this case because of an autism --

14  rule out autism spectrum diagnosis.

15          And, again, I'll give you an opportunity to speak to

16  that.

17          Because what I'm hearing is we're focusing on whether

18  he's a danger, whether he was actually going to engage in

19  joining in terrorist activities, but that's not what he's

20  charged with.  He's charged with lying to the FBI, which he has

21  pled guilty to.  I've read the PSR, and there are multiple

22  instances where he had the wherewithal to cover up his

23  activities and to lie about them.  Why is there a 16-level

24  variance or departure that's appropriate here?

25          MR. NICHOLS:  Two reasons.  But the reason I did talk

1  about the terrorism-related issues is because it is lying to a

2  federal agency in relation to a terrorism investigation.

3        THE COURT:  Right.  And he got a 12-level enhancement

4  for that in the PSR.  I understand that.  But that's -- but

5  I'm -- he lied to the FBI about his activities, and that's his

6  charge.  So where is -- what I'm not hearing is why that

7  warrants such a significant departure from the guidelines or a

8  variance.

9        MR. NICHOLS:  Yes, Your Honor.  Again, it goes to his

10  mental health status and what is -- what we feel is justice in

11  this case.  Yes, we are talking about rule-out diagnoses, which

12  means whoever he's seeing now needs to get to the bottom of the

13  ins and outs of his mental health status.

14        We feel that his mental health difficulties, though,

15  did play into his behavior throughout, even when making

16  statements to the FBI.  And, again, we feel that justice in this

17  case is not Mr. Qashou going to prison.  We feel that that would

18  probably exacerbate potentially these problems and add potential

19  other problems for when he got out.  We feel that the best way

20  to rehabilitate him is to get him mental health treatment that

21  he needs.

22        THE COURT:  All right.  Ms. Irwin, why don't you

23  address the questions I had about why a significant departure or

24  variance -- and I'm not clear which is appropriate -- in a case

25  where the charge -- we're not looking at the reasons behind why

Mr. Qashou reached out to individuals on an encrypted messaging

app and communicated with them.  It's the issue of making a

false statement to the FBI, which he did, according to what I've

read in the PSR, on multiple occasions over the span of several

years.

             MS. IRWIN:  Your Honor, actually, I would like to focus

the attention of the Court on the specific lie that he was

accused of and has pleaded guilty to.  And that was in regards

to flash drives in which he distributed videos.  There were

approximately -- and I may not have this number correct, but

there were approximately 110 videos on those.  He distributed

four flash drives to people who were members of the Islamic

center that he was also a member of.

             Two of those, I believe, were confidential informants

of the FBI.  So they knew the contents of those flash drives.

When he was asked about the flash drives that he distributed, he

told them about approximately 40 of those.  One series that was

included there.  And the following day, he was asked if he could

submit a list of those videos, because he didn't know the exact

names or locations of them off the top of his head, and he did.

He provided an e-mail with those 40.

             I looked carefully, and he did not actually say, these

are the only videos that are on there.  What he says is, these

are some of the videos that are on there.  And the following day

he sends an e-mail and says, these are the videos.

1    I think when he distributed these videos, he may not

2 have understood the sensitive nature of those videos.  He came

3 to learn that later.

4    Again, in February of 2019, at the interview that he

5 has with the FBI, he is specifically asked when he learned that

6 ISIS was -- or IS was on a terrorist list by the state

7 department; that they had been identified as a terrorist

8 organization.  And he said, well, I think you told me.  I

9 learned that at my interview.

10    So this wasn't -- and this is a function of his mental

11 health disorder, this not understanding the context of

12 everything that he has or says or do.  And so I think at some

13 point when, you know, he starts getting interviewed, they say,

14 hey, you know, these videos are from some terrorist

15 organization.  And maybe in his head, he's trying to figure out

16 what the rules are.  And he does have a rule-out diagnosis, but

17 that's more due to the fact that it's difficult to make this

18 kind of diagnosis as an adult.  He exhibits all of the signs of

19 having autism spectrum disorder level one.  And it doesn't mean

20 rule out as in we need to rule that out.  It means we can't rule

21 it out, but we also can't give a formal diagnosis, because we

22 didn't do this testing when he was a child.  But, again, he

23 exhibits all of the symptoms of an adult with ASD.  And I think

24 it likely contributed to his confusion over what was okay; what

25 wasn't okay.  What are they going to point their fingers at me

1   and say that I did?  I don't even know what I did.

2        This is a lot like what was happening with his family,

3   where his family is Muslim, and they're not as conservative as

4   he is, but he's trying really hard to follow the rules of his

5   religion, the religion that he was brought up with and that they

6   brought to him.  And how confusing it must have been to him that

7   they don't want him to follow all the rules in that way.

8        And so I don't think that this lie by omission was to

9   try to further terrorism or to do something.  It was lack of

10  understanding of what is really going on and what is really at

11  stake.  And years later, you can see that he puts this all

12  together.  But even at the point that he's being asked about

13  these videos, he's mostly put that behind him.  He's moved on.

14  His interests have changed, and he's got this disorder that kind

15  of puts him in a little box and he can only see what's right

16  here.  So he can't even remember, like, what -- that wasn't me.

17  That's not me now.  I don't really understand why you're asking

18  me about these things.

19        And so I don't think -- I think that the -- I think

20  that the diagnosis explains that this was not somebody

21  attempting to evade authorities.  In fact, they watch him for

22  years.  This investigation lasted for four to five years.  He

23  showed up for every single interview.  There was a period of

24  time over two weeks, over Christmas break, in which they made

25  him call in every single day, and he called in without fail,

1   every single day.  Even if he didn't have access to his own

2   phone, he got another phone and he called in.  When he got

3   arrested, he showed up for an interview.  He always showed up.

4   He was not evading authorities.  He was not trying to be

5   deceptive.  His whole family was cooperating.  Everybody was

6   coming to every single interview.  And that's the same here.

7        But what wasn't clear to him is what -- what's really

8   at stake and what am I supposed to do.  They're asking him about

9   his grades and his school, and he thinks that they're working

10  with his family to help better his future.

11       And that's exactly why the Court should accept this

12  plea agreement now, is because we have that opportunity to have

13  all of the parties together -- probation, his therapist, his

14  parents, my office -- and we can all work together to help him

15  understand the nature of all of the behavior.

16       He has accepted responsibility for it.  Once he

17  understood what he did wrong, he came before a judge in this

18  court, a magistrate, and he did plead guilty.  But I think that

19  to assume that he needs to be punished in the same way that

20  someone who has the same neurotypical makeup that you and I have

21  and really understands what they're doing is not appropriate.

22       And when you look at the Section 3553(a) factors, after

23  the nature of the offense, which I've just talked about, the

24  next is the history and characteristics of the defendant.  And

25  we're talking about someone who has always been law abiding; who

1 has no criminal history; who wants to do good in this world and

2 is just trying to figure out how to do that. Because he doesn't

3 understand it the same way that you and I understand it.

4 But having been through what he has and having accepted

5 responsibility for it, he does. And we have a whole group of

6 people who can make sure that he continues to learn and grow in

7 the right direction. Not only to make sure this never happens

8 again, but to make sure that he understands the true nature of

9 what happened this particular instance.

10 And five months of imprisonment doesn't sound like a

11 lot when you're looking at this guideline range, but it's

12 appropriate for this defendant, for this particular untruth.

13 THE COURT: Anything else from the government?

14 MR. NICHOLS: No, Your Honor.

15 THE COURT: All right. I'm going to take a five-minute

16 recess.

17 (Recess was taken from 10:55 a.m. until 11:03 a.m., after

18 which proceedings continued, as follows:)

19 THE COURT: I've looked, obviously, very closely at the

20 PSR and all of the documents that were produced for my

21 consideration on what an appropriate range of sentence would be

22 in this case. I'm cognizant of the binding plea. I've read the

23 psychiatric reports and have taken all of those things into

24 consideration with respect to Mr. Qashou.

25 While I'm cognizant of the diagnosis that he may be on

1  the autism spectrum, I don't find that that warrants such a

2  significant departure from the guidelines in this case.  So I'm

3  rejecting the binding plea.

4         Making a false statement to a federal agency is a very

5  serious crime.  It's even more serious as in regards to

6  international terrorism, which is precisely what we have here.

7         I think that the information that I read in the

8  presentence report paints a picture of Mr. Qashou over a pretty

9  significant period of time making multiple misrepresentations to

10  the government about his actions, from not only downloading an

11  encrypted messaging app that enabled him to speak to individuals

12  about potential terrorist activities or travel into Syria,

13  across the border with Jordan, to deleting the app and

14  communicating with individuals on the app that he had been

15  communicating with federal agents.

16         I just -- I fail to see how a diagnosis that Mr. Qashou

17  is on the autism spectrum warrants in this case, under these

18  facts, such a significant reduction in the sentence.  I do not

19  think a sentence of time served is appropriate in this case.

20         Which leaves us with the option, Mr. Qashou, because

21  this was a binding plea, you have an opportunity to withdraw

22  your guilty plea or to persist with your guilty plea and either

23  move forward to sentencing, or we can, if you need time to

24  discuss this with your attorney, put off the sentencing to a

25  later date.

1          Ms. Irwin, you can take time to meet with your client

2   and discuss his options.

3      (Brief pause in the proceedings)

4          MS. IRWIN:  Mr. Qashou would ask to withdraw his plea

5   at this time, Your Honor.

6          THE COURT:  All right.

7          All right, Mr. Qashou.  You want to now withdraw your

8   guilty plea?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  And you want to instead enter a plea of not

11  guilty?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  All right.  Then we will move forward with

14  preparing for trial, then, in this case.

15         Mr. Nichols?

16         MR. NICHOLS:  Yes, Your Honor.

17         THE COURT:  All right.  Mr. Qashou, since you are

18  withdrawing your plea of guilty, you are now entering a plea of

19  not guilty, and we will put this on the trial docket; is that

20  correct?

21         MS. IRWIN:  Yes, Your Honor.  That's correct.

22         THE COURT:  All right.  Is there anything further that

23  we need to do today in light of the withdrawal of the guilty

24  plea?

25         MS. IRWIN:  Can the Court give us some indication of

1  when this will be set for trial?

2          THE COURT:  I'll have to look at my trial term.

3      (Brief pause in the proceedings)

4          THE COURT:  All right.  This is on the Opelika docket.

5  I have a June 20 -- I'm sorry -- July 20th trial term, an August

6  10th.

7          MR. NICHOLS:  Your Honor, we would request that it be

8  set further out than that.  This is likely to be a very lengthy

9  trial with many witnesses and a large amount of evidence.

10         THE COURT:  I have November 2nd.  So let's see.  So

11 I've got August 10th, September 14th, October 19th, November

12 2nd, December 7th.

13         MR. NICHOLS:  October or November, I think, would be --

14 would suffice.

15         MS. IRWIN:  November 2nd would work for us.

16         THE COURT:  November 2nd?

17         MS. IRWIN:  Yes, Your Honor.

18         THE COURT:  All right.  I will get an order out setting

19 this for trial on the November 2nd trial term for Opelika.

20         All right.  Is there anything else today?

21         MR. NICHOLS:  No, Your Honor.  Thank you.

22         MS. IRWIN:  Thank you, Your Honor.

23         THE COURT:  Thank you.

24     (Proceedings concluded at 11:10 a.m.)

25              *  *  *  *  *  *  *  *  *  *  *  *

1                    COURT REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript

3   from the record of the proceedings in the above-entitled matter.

4          This 29th day of July, 2020.

5

6                              /s/ Patricia G. Starkie
                               Registered Diplomate Reporter
7                              Certified Realtime Reporter
                               Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25